UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
TRUSTEES OF THE GENERAL BUILDING
LABORERS' LOCAL 66 PENSION FUND,

Plaintiffs,

**MEMORANDUM AND ORDER**

-against-                                          19-CV-1214 (RRM) (AKT)

J.M.R. CONCRETE CORP.; J.M.R. CONCRETE
OF NEW YORK, CORP.; PIEDMONT REALTY LLC;
XYZ CORPORATIONS 1–10; and JOHN AND JANE
DOES 1–10,

Defendants.
-------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiffs are the Trustees of the General Building Laborers' Local 66 Pension Fund ("the Fund"), a multiemployer plan. Defendant J.M.R. Concrete of New York Corporation ("J.M.R.") was party to a collective bargaining agreement with General Building Laborers' Local 66, which obligated J.M.R. to make contributions to the Fund on behalf of its employees. On March 1, 2019, eight months after J.M.R. ceased operations, plaintiffs filed this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to recover statutorily prescribed withdrawal liability arising from J.M.R.'s complete withdrawal from the Fund.

In late 2020, plaintiffs moved for summary judgment, seeking to recover the withdrawal liability, accrued interest, and liquidated damages from J.M.R. and co-defendant Piedmont Realty LLC ("Piedmont") – allegedly a brother-sister group of business under common control. Defendants opposed that motion and requested arbitration, principally arguing that plaintiffs failed to provide J.M.R. with notifications required by 29 U.S.C. §1399(b)(2)(A) and (c)(5). In a

Memorandum and Order dated September 29, 2021 (the "Prior M&O"), the Court found that plaintiffs had not established compliance with the notification requirements and denied plaintiffs' motion.

Plaintiffs have now filed a second motion for summary judgment which provides evidence detailing the procedures the Fund followed in sending withdraw notifications and other notices to employers.  Defendants have not controverted this evidence and, although they deny having received any notifications from plaintiffs, have not overcome the presumption arising from the "mailbox rule."  Accordingly, plaintiffs' motion is granted and plaintiffs are awarded $309,013 in accelerated withdrawal liability, plus interest, and liquidated damages in the amount of that interest, against defendants J.M.R. and Piedmont, jointly and severally.

BACKGROUND

A.  Withdrawal Liability

The Court assumes familiarity with the Prior M&O, which discussed withdrawal liability and the detailed statutory framework relating to its assessment and collection.  For the convenience of the reader, the Court will repeat those portions of that discussion that are essential to the determination of the instant motion.

Under ERISA, an employer who withdraws from a multiemployer plan … is liable to the plan in the amount determined … to be the withdrawal liability."  29 U.S.C. §1381(a).  "This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets."  *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) (quoting 29 U.S.C. §§1381, 1391).  The employer pays its withdrawal liability in

installments, which are calculated based on the employer's historical contribution amounts. *See* 29 U.S.C. §§1391(c), 1399(c).

The procedure for assessing and collecting withdrawal liability is set forth in 29 U.S.C. §1399. This statute requires that, "[a]s soon as practicable after an employer's … withdrawal [from the multiemployer plan], the plan sponsor … notify the employer of … the amount of the liability, … the schedule for liability payments, and … demand payment in accordance with the schedule." 29 U.S.C. §1399(b)(1). If the employer fails to make a payment when due, and "if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure," then "a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.* §1399(c)(5).

The employer has 90 days from its receipt of the initial notice required by §1399(b)(1) in which to 1) ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments, 2) identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and 3) furnish any additional relevant information to the plan sponsor. *Id.* §1399(b)(2)(A). After receiving the employer's request for review, the plan sponsor is required to notify the employer of the plan's decision, identify the basis for the decision, and explain the reason for "any change in the determination of the employer's liability or schedule of liability payments." *Id.* §1399(b)(2)(B). Once the plan sponsor has responded to the request for review, or once 120 days have passed since the request was made, whichever is later, the employer has 60 days to

3

request arbitration if it wishes to challenge the basis for or the amount of the withdrawal liability assessment. *Id.* §1401(a)(1).

B. Procedural History

The complaint which plaintiffs filed on March 1, 2019, named three defendants – J.M.R., J.M.R. Concrete of New York Corp. ("J.M.R.N.Y."), and Piedmont – as well as ten as-yet-unidentified corporations and ten as-yet-unidentified sole proprietorships. The pleading alleged five causes of action. The first count sought to collect the withdrawal liability, plus liquidated damages and interest, from J.M.R. The next four causes of action sought to collect those same amounts from J.M.R.N.Y., Piedmont, the ten unidentified corporations, and the ten unidentified sole proprietorships, respectively, alleging that these entities were under common control with J.M.R.

On October 15, 2020, plaintiffs voluntarily dismissed J.M.R.N.Y. from the action. (*See* Notice of Voluntary Dismissal (Doc. No. 38).) Plaintiffs never amended the complaint or named any of the unidentified corporations or proprietorships. Accordingly, only J.M.R. and Piedmont (hereafter, "Defendants") remained defendants and only the first and third causes of action remained at issue when the first motion for summary judgment was filed.

The first motion for summary judgment, which was filed in late November 2020, sought withdrawal liability of $309,013, as well as $47,480.70 in interest and $61,802.60 in liquidated damages. In support of that motion, plaintiffs submitted, among other things, a declaration of Allen Marmor, the Fund Manager, who claimed to have "sent" J.M.R. the three notices required by the procedures set forth in 29 U.S.C. §1399. In response to the motion, Defendants submitted a declaration of Mr. Ramos, who claimed that neither he nor J.M.R. received any of Marmor's three letters. (Ramos Dec. (Doc. No. 44) at ¶¶ 7–8.) In their reply, plaintiffs argued that

Marmor's claim that he sent all three letters to J.M.R. created a presumption that they were received. (Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment ("Reply Memo") (Doc. No. 45) at 2.) Plaintiffs also argued, in the alternative, that even if the original copies of the letters were never received, Defendants received copies of the letter on March 5, 2019, when the complaint – which attached copies of all three letters – was served on them. (*Id.* at 3.)

In the Prior M&O, the Court denied plaintiffs' motion for summary judgment in its entirety. The Court acknowledged that "proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." (Prior M&O (Doc. No. 47) at 17.) However, the Court noted that in order to invoke the presumption, a party has to "prove that the letter was properly addressed, stamped, and mailed." (*Id.*) The Marmor Declaration, which stated only that the three letters had been "sent," did not provide sufficient details regarding the mailing to give rise to the presumption.

The Court did not address plaintiffs' contention that service of the complaint, which attached copies of all three notices, satisfied §1399's notice requirements. The Court noted that this argument was not raised in the original motion papers, but was raised for the first time in the Reply Memo. In addition, plaintiffs had not provided authority to support this argument. Citing cases for the proposition that "[r]eply papers are not the proper place for new arguments," the Court declined to rule on this argument. (*Id.* at 10.)

C. The Instant Motion

Plaintiffs have now filed a second motion for summary judgment which attempts to cure the deficiencies in the previous motion in two ways. First, Plaintiffs have submitted a second

declaration from Allen Marmor (the "Second Marmor Declaration") which explains in greater detail the procedure the Fund used in sending the notices required by 29 U.S.C. §1399.  Second, plaintiffs have renewed the argument which was contained only in the Reply Memo in support of the first motion:  namely, that they provided the notices required by §1399 when they served their complaint and first motion for summary judgment and when they sent Defendants various litigation-related documents containing the three letters.  That argument is specifically raised in the Memorandum of Law in Support of Plaintiffs' Second Motion for Summary Judgment ("Plaintiffs' Memo") and is supported by a declaration from plaintiff's counsel, Neil V. Shah (the "Shah Declaration"), the pertinent parts of which are discussed below.

The Second Marmor Declaration states that it was Marmor's "general practice" to arrange for the notices required by §1399 to be sent to employers by both UPS and certified mail, return receipt requested.  (2d Marmor Dec. (Doc. No. 56-12) at ¶ 6.)  He would prepare and sign the notices, and a Fund employee would prepare the mailing labels and leave the packages in the Fund mailroom for pickup.  (*Id.* at ¶¶ 5-6.)  Marmor followed this general practice in sending the notices to J.M.R. and Piedmont.  He specifically recalls that he prepared and signed each of the three notices he sent to J.M.R., and that Deborah Romaneck, a Fund Supervisor, "prepared the labels and arranged for pickup."  (*Id.* at ¶¶ 9, 11, 13.)  According to Marmor, Romaneck addressed the mailings to 375 Wyandanch Avenue, North Babylon, New York – the address provided by both J.M.R. and Piedmont in their corporate registrations with the New York Secretary of State.  (*Id.* at ¶¶ 8, 9, 11, 13.)

Marmor's Declaration provides no proof that any of three notices were actually picked up by UPS or that they were received by J.M.R. or Piedmont.  Plaintiffs have not provided an affidavit from Romaneck attesting to her actions, or any receipts or other documentary evidence

6

from UPS.  Rather, Marmor implies that customers could track their packages within 120 days of

mailing, but that the Fund failed to timely access the tracking information.  (*Id.* at ¶¶ 10, 12, 14.)

The Second Marmor Declaration also does not provide documentary evidence regarding

the certified mailing of the first letter.  Marmor states only that he does not have "any record of

having received a Certified Mail return receipt … regarding that delivery."  (*Id.* at ¶ 10.)

However, the declaration provides more information regarding the other two certified mailings.

Marmor states that he caused the second letter – the notice of default – to be mailed on

December 17, 2018, but that the envelope and the return receipt were returned by the United

States Postal Service, marked "Refused," in mid-January 2019.  (*Id.* at ¶¶ 11-12.)  The Second

Marmor Declaration attaches three exhibits to corroborate this statement:  a copy of a Certified

Mail Receipt, which indicates that something was sent to Mr. Ramos at 375 Wyandanch on

December 17, 2018, (*Id.*, Ex. 6 (Doc. No. 56-18)); a copy of the returned envelope, (*id.*, Ex. 7

(Doc. No. 56-19)); and the Return Receipt, which was signed by someone on December 20,

2018, (*id.*, Ex. 87 (Doc. No. 56-20)).

Marmor also states that he caused the third letter – the notice of acceleration – to be

mailed on February 19, 2019, but that the envelope was subsequently returned by the United

States Postal Service for having an "insufficient address."  (*Id.* at ¶¶ 13-14.)  The Marmor

Declaration attaches two exhibits to corroborate this statement:  a copy of a Certified Mail

Receipt, which indicates that something was sent to Mr. Ramos at 375 Wyandanch, (*id.*, Ex. 10

(Doc. No. 56-22)), and a copy of the returned envelope, marked "IA," (*id.*, Ex. 7 (Doc. No. 56-

19)).

The Shah Declaration lists five occasions in which the three notices were served on, or

mailed to, Defendants during this litigation.  First, the notices, which were attached to the

complaint, were served on Defendants when the pleading and summonses were served on the

New York Secretary of State on March 5, 2019.  (Shah Dec. (Doc. No. 41-3) at ¶ 5.)  Second, the

notices were mailed to the Defendants by the process server on March 6, 2019.  (*Id.* at ¶ 6.)

Third, the notices were among the documents supplementing Plaintiffs' initial Rule 26

disclosures that Shah emailed to Defendants' counsel on November 7, 2019.  (*Id.* at ¶ 7.)  Fourth,

Shah included the notice in his first motion for summary judgment, which Shah sent to

Defendants via email and overnight mail on October 16, 2020.  (*Id.* at ¶ 8.)  Fifth, that motion,

including the notices, were electronically filed with the Court on November 24, 2020.  (*Id.* at ¶

9.)

### D.  Defendants' Response

In response to plaintiff's motion, Defendants have submitted declarations from Manuel

Ramos – the President of J.M.R. – and his wife, Noemia Ramos.  According to Mr. Ramos, he

formed J.M.R. in or about 1990 with two partners.  (Declaration of Manuel Ramos (Doc. No. 60)

at ¶ 3.)  Mr. Ramos bought the partners' interests when they retired, eventually becoming the

sole shareholder of J.M.R.  (*Id.* at ¶¶ 1, 3.)

While both Mr. and Ms. Ramos deny that Ms. Ramos was ever an officer, director, or

shareholder of J.M.R., (*id.* at ¶ 4; Declaration of Noemia Ramos (Doc. No. 59) at ¶ 3), they state

that they were once co-owners of Piedmont.  (Manuel Ramos Dec. at ¶ 5; Noemia Ramos Dec. at

¶ 4.)  However, at some point, Mr. Ramos transferred his interests in Piedmont to his wife in

exchange for her assistance in arranging for Piedmont to borrow money to assist J.M.R. in

paying its debts to Capital One Bank and the State of New York.  (*Id.*)  Thereafter, Ms. Ramos

was the sole member of Piedmont.  (Noemia Ramos Dec. at ¶ 1.)  Although the declarations do

not state precisely when Mr. Ramos transferred his interests in Piedmont, Mr. Ramos's

declaration states that J.M.R. began to have severe financial difficulties in 2014, and ceased operations altogether in March 2015.  (Manuel Ramos Dec. at ¶ 6.)

According to Mr. Ramos, Piedmont purchased the real property at 375 Wyandanch Avenue.  (*Id.* at ¶ 5.)  J.M.R. then leased part of the property to operate its business.  (*Id.*)  Mr. Ramos denies that J.M.R. ever received or refused delivery of any of the three notices allegedly sent by Marmor to the Wyandanch Avenue address, (*id.* at ¶ 8), and Ms. Ramos states that she never received any of the notices either.  (Noemia Ramos Dec. at ¶ 5.)  The Ramoses assert that plaintiffs knew their home address, (Manuel Ramos Dec. at ¶ 10; Noemia Ramos Dec. at ¶ 7), and Mr. Ramos faults plaintiffs for sending the notices to 375 Wyandanch despite knowing that J.M.R. was no longer operating, (Manuel Ramos Dec. at ¶ 10.)

Both of the Ramoses admit that they were served with summonses and copies of the complaint, which attached copies of the three notices.  (Manuel Ramos Dec. at ¶ 9; Noemia Ramos Dec. at ¶ 6.)  Mr. Ramos claims that he attempted to enter into arbitration after receiving the complaint, but that plaintiffs refused to arbitrate, claiming that he had waived that right by not responding previously to the notices.  (Manuel Ramos Dec. at ¶ 9.)

STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under the governing law."  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion.").

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation"). In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

"Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). "[T]he failure to respond to the motion does not alone discharge the burdens imposed on a moving party." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Wilson v. Air*

*Serv Corp.*, 705 F. App'x 43, 44 (2d Cir. 2017) (summary order) (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 244).   In addition, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Id.* (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 242).

DISCUSSION

A. <u>The Second and Successive Motion</u>

Preliminarily, the Court must address the question of whether it is appropriate to entertain a second motion for summary judgment from plaintiffs in this case.  The Second Circuit has noted that "successive motions for summary judgment may be procedurally improper if the arguments in the second motion could have been raised in the first motion." *Brown v. City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012) (citing *Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.*, 221 F.R.D. 409, 409 (S.D.N.Y. 2004)).  And some district courts have "held that parties 'should not be allowed to bring' a 'second or successive dispositive motion to correct deficiencies in the original motion.'" *Johnson v. Gagnon*, No. 14-CV-916 (MAD)(DEP), 2016 WL 5408161, at *3 (N.D.N.Y. Sept. 28, 2016) (quoting *Jackson v. Goord*, No. 06-CV-6172 (CJS), 2013 WL 1560204, at *5 (W.D.N.Y. April 10, 2013)).  These courts posit that allowing defendants who failed to satisfy their burdens on their first attempt at summary judgment to submit successive summary judgment motions "would essentially remove the incentive for filing a well-reasoned motion that puts forth a party's most persuasive arguments in the first instance" and "would undoubtedly lead to a dramatic increase in successive motions." *Johnson*, 2016 WL 5408161, at *3.

This rule, however, is not uniformly followed and has never been endorsed by the Second Circuit.  Rather, the Second Circuit has noted that district courts "enjoy considerable discretion

11

in entertaining successive dispositive motions," *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004),

and "may in their discretion permit renewed or successive motions for summary judgment,

particularly when the moving party has expanded the factual record on which summary judgment

is sought." *Brown*, 673 F.3d at 147 n.2) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806,

835 (6th Cir. 2000)); *see Bonano v. Doe*, 628 F. App'x 25, 27 (2d Cir. 2015) (summary order).

District courts in this Circuit have used that discretion to permit successive motions for summary

judgment in which defendants' counsel failed "to recognize the scope of the proof needed" on a

particular issue and therefore errantly omitted "additional undisputed factual submissions" that

would have established defendants' position on that issue. *Frederick v. Off. of Mental Health,*

*Rochester Psychiatric Ctr.*, 515 F. Supp. 3d 29, 32 (W.D.N.Y. 2021).

  In this case, as in *Frederick*, plaintiffs initially failed to recognize the degree of proof

necessary on a particular issue and, as a result, did not provide certain undisputed factual

submissions.  Specifically, plaintiffs incorrectly assumed that Marmor's representations that he

"sent" the required notices to J.M.R. were sufficient to permit the Court to presume that the

mailing were received.  In addition, plaintiffs omitted from their original motion the argument

that defendants received the notices in the course of this litigation, and raised that argument only

in the Reply Memo.  Like the movants in *Frederick*, plaintiffs promptly sought to rectify those

shortcomings by filing a second motion.  And Defendants, who have not filed a memorandum of

law in opposition to plaintiffs' second motion for summary judgment, have not argued that they

would be prejudiced by consideration of the successive motion.  Accordingly, the Court, in its

discretion, will entertain this second motion for summary judgment.

B. <u>The Mailbox Rule</u>

The only factual question presented in this motion for summary judgment is whether J.M.R. received the three notices required by ¶1399.  Although the Second Marmor Declaration states that plaintiffs sent the notices via UPS and certified mail, plaintiffs have provided little or no proof that the notices were actually received.  First, the Fund does not have any proof that any of the UPS mailings were received because "UPS tracking information is not available after 120 days."  (2d Marmor Dec. at ¶¶ 10, 12, 14.)  Second, plaintiffs do not provide documentary evidence regarding the certified mailing of the first notice and Marmor states that plaintiffs do not have "any record of having received a Certified Mail return receipt … regarding that delivery."  (*Id.* at ¶ 10.)

Plaintiffs have provided some documentary evidence relating to the other certified mailings, but only equivocal evidence of actual receipt.  With respect to the second mailing, the notice of default, plaintiffs received both a signed copy of the return receipt and the envelope in which the mailing was sent, marked "Refused."  (*Id.* at ¶ 12.)  However, the signature on the return receipt is illegible and Mr. Ramos expressly denies that J.M.R. ever refused delivery of any of the notices.  (Mr. Ramos Dec. at ¶8.)  Similarly, with respect to the third mailing, the notice of acceleration, the United States Postal Service returned the envelope in which the mailing was sent, marked "IA"  (2d Marmor Dec. at ¶ 14.)  Although one could assume, as Marmor did, that "IA" stood for "insufficient address," there is no evidence that someone at J.M.R. caused the envelope to be returned.

In the absence of substantial evidence of J.M.R.'s actual receipt of the notice, plaintiffs rely on the presumption of receipt established by the "mailbox rule."  This rule establishes "a rebuttable, common-law presumption that a piece of mail, properly addressed and mailed in

accordance with regular office procedures, has been received by the addressee." *Cooke v. United States*, 918 F.3d 77, 81 (2d Cir. 2019) (citing *Akey v. Clinton Cty.*, 375 F.3d 231, 235 (2d Cir. 2004)). "Once the mailbox rule presumption arises, a party's mere allegation that it did not receive the letter or notice does not rebut the presumption." *Tarnarider v. 21st Century Ins. & Fin. Servs., Inc.*, No. 18-CV-1882 (BMC), 2018 WL 3339524, at *2 (E.D.N.Y. July 6, 2018). "There must be – in addition to denial of receipt – some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Id.* (quoting *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993)).

In support of this second motion for summary judgment, plaintiffs have adduced evidence that the mailings containing the three notices were properly addressed and mailed in accordance with regular office procedures. First, according to Marmor, all three notices were mailed to J.M.R. at 375 Wyandanch – the address listed for the corporation on the New York State Department of State's website. (2d Marmor Dec. at ¶¶ 8-9, 11, 13.) Although Mr. Ramos claims that J.M.R. ceased operation in March 2015 and that plaintiffs were aware of this fact, (Mr. Ramos Dec. at ¶¶ 6, 10), the Court notes that the Department of State's website still listed J.M.R. as an active corporation as of October 2022, when the Second Marmor Declaration was signed. (2d Marmor Dec., Ex. 2 (Doc. No. 56-14) at 2.) Since "corporations are required to maintain a valid service of process address with the Secretary of State," *Hartford Fire Ins. Co. v. Queens Cnty. Carting, Inc.*, No. 20-CV-1844 (NSR), 2022 WL 254367, at *3 (S.D.N.Y. Jan. 27, 2022), Marmor acted properly in using this address.

Second, the notices were mailed in accordance with regular office procedures. The Second Marmor Declaration describes those procedures: Marmor would prepare and sign the letters, and a Fund employee would prepare the mailing labels and leave the packages in the

Fund mailroom for pickup.  (2d Marmor Dec. at ¶¶ 5-6.)  Marmor recalled following this general

practice in sending the notices to J.M.R, stating that he prepared and signed each of the three

notices he sent to J.M.R., and that Deborah Romaneck, a Fund Supervisor, "prepared the labels

and arranged for pickup."  (*Id.* at ¶¶ 9, 11, 13.)  Marmor's recollections are corroborated by

various exhibits attached to his declaration, including copies of return receipts and envelopes

relating to the latter two of the three certified mailings.

      This evidence that the notices were properly addressed and mailed in accordance with

regular office procedures is sufficient to create the presumption that the notices were received by

J.M.R.  *See Cooke*, 918 F.3d at 81.  Defendants have not adequately rebutted that presumption.

To be sure, Mr. Ramos denies that J.M.R. ever received any of the three notices, (Mr. Ramos

Dec. at ¶ 8), and Ms. Ramos – who controls Piedmont, the owner of 375 Wyandanch – denies

that she ever received them, (Ms. Ramos Dec. at ¶ 5).  But these denials, without more, are

insufficient to rebut the presumption of receipt.  *See Tarnarider*, 2018 WL 3339524, at *2.

      Even if the mailbox rule did not permit the presumption that J.M.R. received the notices,

there is no question that Defendants received the notices when they were served with the

summonses and complaint in this action.  Those notices were attached to the complaint and

incorporated therein.  According to affidavits of service that were filed on the docket by

plaintiffs' process server, the complaint was served on J.M.R. and Piedmont in March 2015.

(Docs. No. 7 & 9.)

      As plaintiffs correctly note, several courts in the Second Circuit have recognized "that the

filing of a civil complaint can constitute sufficient notice under … §1399." *LaBarbera v. United*

*Crane & Rigging Servs.*, Nos. 08-CV-3274 (DLI)(ALC), 08-CV-3983 (DLI)(ALC), 2011 WL

1303146, at *3 (E.D.N.Y. Mar. 2, 2011) (quoting *Amalgamated Lithographs of Am. v. Unz &*

*Co., Inc.*, 670 F. Supp. 2d 214, 225 (S.D.N.Y. 2009)); *see also Bowers v. Transportacion Maritima Mexicana*, 901 F.2d 258, 263 (2d Cir. 1990); *Trs. of Local 531 Pension Plan v. Corner Distribs., Inc.*, No. 07-CV-529 (ARR)(MDG), 2008 WL 2687085, at *4 (E.D.N.Y. 2008); *Board of Trs. of Trucking Emp. of North Jersey Welfare Fund v. Canny*, 900 F.Supp. 583, 591 (N.D.N.Y. 1995). Service of the complaint "may be 'sufficient notice to trigger the arbitration requirement' if the complaint contains 'the amount of the assessment, the schedule of payments, and the demand for payment.'" *Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. B & M Escorts, Inc.*, No. 16-CV-2498 (SFJ)(SIL), 2018 WL 2417842, at *10 (E.D.N.Y. May 29, 2018) (quoting *Canny*, 900 F.Supp. at 591, 592). Moreover, "[f]or purposes of notifying control group members of withdrawal liability, '[n]otice as to one member … is considered as notice to all members.'" *Trs. of Local 813 Pension Trust Fund v. Canal Carting, Inc.*, No. 12-CV-60 (CBA)(RLM), 2014 WL 843244, at *11 (E.D.N.Y. Mar. 3, 2014) (quoting *Trs. of Amalgamated Ins. Fund v. Saltz*, 760 F.Supp. 55, 58 (S.D.N.Y. 1991)).

C. <u>The Failure to Arbitrate</u>

Regardless of whether Defendants received the initial notice in late August 2018, after it was mailed by Marmor, or in early March 2019, when the complaint was served on Defendants, it is beyond dispute that Defendants did not initiate an arbitration within the time period specified in 29 U.S.C. §1401(a)(1). The Fund's Withdrawal Liability Procedures provide that disputes will be "resolved in accordance with the Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability of the American Arbitration Association" or "AAA." (2d Marmor Dec., Ex. 11, at § 16.) The Arbitration Rules that were in effect in 2018 and 2019 dictate the following procedure for initiating an arbitration:

> The initiating party gives notice to the other party of its intention to arbitrate (Demand) which notice shall set forth a brief description

> of the dispute and shall include the amount involved, and … files
> at any Regional Office of the AAA two (2) copies of said notice,
> together with the appropriate administrative fee as provided in the
> Administrative Fee Schedule.

AAA, Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes (rev. 2/1/2013) (available at https://www.adr.org) (last visited 8/15/2023).  While 29 U.S.C. §1401(a)(1) does not require parties to initiate arbitration pursuant to the AAA rules, "the cases make clear that … courts will find that the parties failed to initiate arbitration where the trust funds' rules specifically required the employer to initiate arbitration pursuant to AAA rules" and the employer failed to do so.  *Am. Fed'n of Musicians & Employers' Pension Fund v. Neshoma Orchestra & Singers, Inc.*, 974 F.3d 117, 122 (2d Cir. 2020) (internal quotation marks and citation omitted.)

Although Mr. Ramos claims that he "attempted to enter into arbitration" with plaintiffs when "this lawsuit was commenced," (Mr. Ramos Dec. at ¶ 9), he does not claim – much less provide any evidence to show – that he followed the above-described procedure or initiated an arbitration.  Indeed, neither J.M.R. nor Piedmont has controverted paragraph 46 of plaintiffs' Rule 56.1 Statement, which states that "No party has ever commenced arbitration regarding plaintiffs' assessment of their withdrawal liability."  (Plaintiffs' Statement of Undisputed Material Facts ("Plaintiffs' 56.1 Statement") (Doc. No. 56-2) at ¶ 46.)  Since an uncontroverted paragraph in a Rule 56.1 Statement is "deemed to be admitted for purposes of the motion," Local Civil Rule 56.1(c), the Court concludes that Defendants did not engage in arbitration.

Under the terms of 29 U.S.C. §1401(b)(1), "[i]f no arbitration proceeding has been initiated pursuant to [§1401](a), the amounts demanded by the plan sponsor under section 1399(b)(1) … shall be due and owing on the schedule set forth by the plan sponsor."  Thus, an employer who "fails to arbitrate a dispute over its withdrawal liability … generally waives the

right to contest the propriety and amount of withdrawal liability." *Trustees of Nat'l Ret. Fund v. Fireservice Mgmt. LLC*, 384 F. Supp. 3d 412, 422 (S.D.N.Y. 2019) (quoting *Durso v. Store 173 Food Corp.*, No. 16-CV-9456 (JGK), 2018 WL 6268218, at *3 (S.D.N.Y. Nov. 30, 2018); *see UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, No. 04-CV-9869 (BSJ), 2009 WL 2025163, at *4 (S.D.N.Y. July 13, 2009) ("[The employer] did not request arbitration within the statutory time period; that failure precluded [the employer] from challenging Plaintiff's determination of its liability.") Recognizing that Congress established this "procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner" to further its intentions "that disputes over withdrawal liability would be resolved quickly," the Second Circuit "has held that [it] will not 'disregard the clear language of the statute in order to relieve [an employer] of the consequences of its failure to meet the time limitations imposed by the Act.'" *Am. Fed'n of Musicians & Employers' Pension Fund*, 974 F.3d at 121 (quoting *ILGWU Nat. Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 887 (2d Cir. 1988)).

In light of the foregoing, the Court holds that J.M.R. is liable for $309,013 in accelerated withdrawal liability, as calculated by the Fund's actuary and as set forth in Marmor's letter to Mr. Ramos dated August 29, 2018. (2d Marmor Dec., Ex. 4 (Doc. No. 56-16).) That letter demanded that J.M.R. commence paying that amount to the Fund on October 28, 2018. (*Id.*) Since it undisputed that the Fund never received any portion of this amount, (Plaintiffs' 56.1 Statement at ¶ 14), plaintiffs will be awarded the entire $309,013.

### D. Interest and Liquidated Damages

In addition to the $309,013 in accelerated withdrawal liability, plaintiffs are entitled to interest and liquidated damages as provided in 29 U.S.C. § 1132(g)(2). This subsection provides, in pertinent part:

> In any action under this subchapter by a fiduciary for or on behalf
> of a plan to enforce section 1145 of this title in which a judgment
> in favor of the plan is awarded, the court shall award the plan—
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions, [and]
>
> (C) an amount equal to the greater of—
>
>> (i) interest on the unpaid contributions, or
>>
>> (ii) liquidated damages provided for under the plan in an
>> amount not in excess of 20 percent (or such higher
>> percentage as may be permitted under Federal or State
>> law) of the amount determined by the court under
>> subparagraph (A) ….

29 U.S.C. § 1132(g)(2).[1]  That subsection further provides that "interest on unpaid contributions

shall be determined by using the rate provided under the plan, or, if none, the rate prescribed

under section 6621 of Title 26."  *Id.*

It is undisputed that "[p]ursuant to the authority delegated to the Trustees under Article V

of the Fund's Trust, the Trustees have adopted Withdrawal Liability Procedures" that dictate

how interest is to be calculated.  (Plaintiffs' 56.1 Statement at ¶¶ 4-5.)  Those procedures provide

that "interest shall accrue from the due date until the date on which the payment is made … at

the rate established by the Pension Benefit Guaranty Corporation ('PBGC') pursuant to Section

4219(c)(6) of ERISA or at the prime rate, plus 3%, whichever is greater."  (Withdrawal Liability

Procedures (Doc. No. 56-23).)  This language is ambiguous; it could be read as stating that

interest should be calculated by adding 3% to the greater of the rate established by the PBGC or

the prime rate.  However, plaintiffs interpret it to mean that "interest is due from the date of the

first payment at the greater of: (i) the rate established by the … PBGC … or (ii) at the prime rate,

---

[1] In an action to compel an employer to pay withdrawal liability, the employer's failure to make any withdrawal
liability payment within the time prescribed is "treated in the same manner as a delinquent contribution (within the
meaning of section 1145 … )."  29 U.S.C. §1451(b).

plus 3%."  (Plaintiffs' Memo at 12.)  Since Defendants have not filed a memorandum of law in response to plaintiffs' motion, this Court will adopt this interpretation.

Plaintiffs have calculated the interest due for the period from October 28, 2018, to October 7, 2022 – the date of Plaintiffs' Memo – at $86,339.09.  This exceeds 20% of the accelerated withdrawal liability, which would be $61,802.60.  Accordingly, under 29 U.S.C. §1132(g)(2)(C), plaintiffs will be awarded twice the amount of interest calculated pursuant to the Fund's Withdrawal Liability Procedures.

E.  Common Control

"Under 29 U.S.C. §1301(b)(1), 'all employees of trades or businesses … which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer' for the purposes of determining withdrawal liability under ERISA."  *New York State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 173 (2d Cir.), *cert. denied*, 142 S. Ct. 2876 (2022).  "ERISA adopts a definition of 'common control' from tax regulations," *id.*, which define "two or more trades or businesses under common control" to include a "brother-sister group of trades or businesses under common control …."  26 C.F.R. §1.414(c)-2(a).  The regulations further define the term "brother-sister group of trades or businesses under common control" to mean "two or more organizations conducting trades or businesses if (i) the same five or fewer … individuals … own (directly and with the application of §1.414(c)-4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization."  *Id.* §1.414(c)-2(c).

Section 1.414(c)-4 – the regulation referenced in the above definition – contains a specific rule governing ownership interests between spouses. That rule, known as the "spousal attribution" or "family attribution" regulation, provides: "Except as provided in paragraph (b)(5)(ii) of this section, an individual shall be considered to own an interest owned, directly or indirectly, by or for his or her spouse, other than a spouse who is legally separated from the individual under a decree of divorce, whether interlocutory or final, or a decree of separate maintenance." 26 C.F.R. §1.414(c)-4(b)(5)(i).  Paragraph (b)(5)(ii) provides:

> An individual shall not be considered to own an interest in an organization owned, directly or indirectly, by or for his or her spouse on any day of a taxable year of such organization, provided that each of the following conditions are satisfied with respect to such taxable year:
>
>> (A) Such individual does not, at any time during such taxable year, own directly any interest in such organization;
>>
>> (B) Such individual is not a member of the board of directors, a fiduciary, or an employee of such organization and does not participate in the management of such organization at any time during such taxable year;
>>
>> (C) Not more than 50 percent of such organization's gross income for such taxable year was derived from royalties, rents, dividends, interest, and annuities; and
>>
>> (D) Such interest in such organization is not, at any time during such taxable year, subject to conditions which substantially restrict or limit the spouse's right to dispose of such interest and which run in favor of the individual or the individual's children who have not attained the age of 21 years.

The burden is on defendants to prove the application of the spousal attribution exception.  *Int'l Painters & Allied Trades Indus. Pension Fund v. I. Losch Inc.*, No. 19-CV-3494 (BPG), 2022 WL 4386232, at *7 n.10 (D. Md. Sept. 22, 2022).

In this case, the declarations of Mr. and Ms. Ramos establish that J.M.R. and Piedmont are under common control.  Mr. Ramos states that he is the sole shareholder of J.M.R., (Mr.

Ramos Dec. at ¶ 1), and Ms. Ramos states that she is the sole member of Piedmont, (Ms. Ramos Dec. at ¶ 1). Ms. Ramos' Declaration refers to Mr. Ramos as her husband, (*id.* at ¶ 4), and indicates that they share a home in Dix Hills, New York, (*id.* at ¶ 7). Similarly, Mr. Ramos' Declaration refers to Ms. Ramos as his wife. (Ms. Ramos Dec. at ¶ 5.) Neither declaration suggests that the Ramoses have legally separated, and Defendants have not attempted to establish that the spousal attribution exception applies in this case. In light of these facts, the Court concludes that J.M.R. and Piedmont are "brother-sister" entities and are jointly and severally liable for the accelerated withdrawal liability, the interest, and the liquidated damages.

## CONCLUSION

For the reasons set forth above, the Court grants plaintiffs' second motion for summary judgment. Plaintiffs are awarded $309,013 in accelerated withdrawal liability, plus interest, and liquidated damages in the amount of that interest, against defendants J.M.R. and Piedmont, jointly and severally. Interest shall be calculated from October 29, 2018, to the date of judgment at the greater of: (i) the rate established by the PBGC pursuant to Section 4219(c)(6) of ERISA or (ii) the prime rate, plus 3%. Plaintiffs are directed to calculate the interest due as of October 6, 2023, and to submit an affidavit, on or before October 5, 2023, stating the amount of the interest and explaining how it was calculated.

SO ORDERED.

Dated: Brooklyn, New York
      September 29, 2023

*Roslynn R. Mauskopf*
ROSLYNN R. MAUSKOPF
United States District Judge